1   **BRODSKY & SMITH, LLC**
    Evan J. Smith, Esquire (SBN 242352)
2   esmith@brodskysmith.com
    Ryan P. Cardona, Esquire (SBN 302113)
3   rcardona@brodskysmith.com
    9595 Wilshire Boulevard, Suite 900
4   Beverly Hills, CA 90212
    Phone: (877) 534-2590
5   Facsimile: (310) 247-0160

6   *Attorneys for Plaintiff*

7
                    **IN THE UNITED STATES DISTRICT COURT**
8
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9

10  GERALD CLARKE, on behalf of himself          **Civil Action No. _____**
    and all others similarly situated,
11
                              Plaintiff,          **CLASS ACTION COMPLAINT FOR BREACH
12                                                OF FIDUCIARY DUTIES AND VIOLATIONS
                    vs.                           OF SECTIONS 14(a) AND 20(a) OF THE
13                                                SECURITIES EXCHANGE ACT OF 1934**
    QUANTENNA COMMUNICATIONS,
14  INC., SAM HEIDARI, GLENDA
    DORCHAK, NED HOOPER, HAROLD                   **JURY TRIAL DEMANDED**
15  HUGHES, JACK LAZAR, JOHN SCULL,
    and MARK A. STEVENS,
16
                              Defendants.
17

18       Plaintiff, Gerald Clarke ("Plaintiff"), by his attorneys, on behalf of himself and those

19  similarly situated, files this action against the defendants, and alleges upon information and belief,

20  except for those allegations that pertain to him, which are alleged upon personal knowledge, as

21  follows:

22                          **SUMMARY OF THE ACTION**

23       1.      Plaintiff brings this stockholder class action on behalf of himself and all other

24  public stockholders of Quantenna Communications, Inc. ("Quantenna" or the "Company"),

25  against Quantenna and the Company's Board of Directors (the "Board" or the "Individual

26  Defendants," collectively with the Company, the "Defendants"), for violations of Sections 14(a)

27  and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and breaches of

28

fiduciary duty as a result of Defendants' efforts to sell the Company to ON Semiconductor ("Parent"), and Raptor Operations Sub, Inc. ("Merger Sub," collectively with Parent, "ON Semiconductor") as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on a proposed all cash transaction valued at approximately $936 million (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a March 27, 2018, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").  Under the terms of the Merger Agreement, Quantenna will become an indirect wholly-owned subsidiary of ON Semiconductor, and Quantenna stockholders will receive $24.50 in cash for each share of Quantenna common stock they own.  As a result of the Proposed Transaction, Plaintiff and other Quantenna stockholders will be frozen out of any future ownership interest in the Corporation.

3.      Thereafter, on May 3, 2019, Quantenna filed a Preliminary Proxy Statement on Schedule 14A (the "Preliminary Proxy") with the SEC in support of the Proposed Transaction.

4.      In addition, the Proposed Transaction is unfair and undervalued for a number of reasons.  Significantly, the Preliminary Proxy describes an insufficient sales process in which the Board rushed through an inadequate "sales process" in which the only end goal was a sale to ON Semiconductor, and in which no disinterested committee of Quantenna directors was created to run the sales process.

5.      Such a sales process, or lack thereof, clearly indicates that the only end-goal acceptable to the Defendants was an acquisition of Quantenna by ON Semiconductor.

6.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Quantenna without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or ON Semiconductor without regard for Quantenna public stockholders.  Accordingly, this action seeks to enjoin the Proposed

1  Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to

2  Quantenna stockholders.

3      7.      Next, it appears as though the Board has entered into the Proposed Transaction to

4  procure for themselves and senior management of the Company significant and immediate benefits

5  with no thought to the Company's public stockholders.  For instance, pursuant to the terms of the

6  Merger Agreement, upon the consummation of the Proposed Transaction, Company Board

7  Members and executive officers will be able to exchange all Company equity awards for the

8  merger consideration.  Moreover, certain Directors and other insiders will also be the recipients of

9  lucrative change-in-control agreements, triggered upon the termination of their employment as a

10 consequence of the consummation of the Proposed Transaction.

11     8.      According to the Preliminary Proxy, "[a]ssuming the merger was completed on

12 April 29, 2019, the estimated aggregate amount that would be payable to Quantenna's executive

13 officers (i.e., Messrs. Heidari, Sobers and Carroll) as a group for their Quantenna equity awards is

14 as follows: (a) with respect to vested Quantenna stock options (including stock options that will

15 vest in connection with the merger), $28,693,117, (b) with respect to unvested Quantenna stock

16 options (that may become payable after the effective time as described above), $5,638,675, (c)

17 with respect to vested Quantenna RSUs (including RSUs that will vest in connection with the

18 merger), $0, and (d) with respect to unvested Quantenna RSUs (that may become payable after the

19 effective time as described above and assuming PSUs will be eligible to vest as to 100% of the

20 target number of shares subject to the award based on the actual level of achievement of the

21 applicable performance goals through the effective time), $10,795,925 (or $11,815,125 assuming

22 the PSUs would be eligible to vest as to the maximum number of PSUs subject to the award based

23 on the actual level of achievement of the applicable performance goals through the effective

24 time)."

25     9.      In violation of sections 14(a) and 20(a) of the Exchange Act and in further violation

26 of their fiduciary duties, Defendants caused to be filed the materially deficient Preliminary Proxy

27 on May 3, 2019 with SEC in an effort to solicit stockholders to vote their Quantenna shares in

28

favor of the Proposed Transaction. The Preliminary Proxy is materially deficient, deprives Quantenna stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction, and is thus in breach of the Defendants fiduciary duties. As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Quantenna and ON Semiconductor, provided by Quantenna and ON Semiconductor to the Company's financial advisor Qatalyst Partners ("Qatalyst") for use in its financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, Qatalyst.

10.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

11.     Plaintiff is a citizen of Illinois and, at all times relevant hereto, has been a Quantenna stockholder.

12.     Defendant Quantenna designs, develops, and markets wireless communication solutions enabling wireless local area networking in the Asia-Pacific, Europe, the Middle East, Africa, and the Americas. Quantenna is incorporated under the laws of the State of Delaware and has its principal place of business at 1704 Automation Parkway San Jose, CA 95131. Shares of Quantenna common stock are traded on the NasdaqGS under the symbol "QTNA."

13.     Defendant Sam Heidari ("Heidari") has been a Director of the Company at all relevant times. In addition, Heidari serves as the Chairman of the Company Board and the Company's Chief Executive Officer ("CEO").

14. Defendant Michael Hurlston ("Hurlston") has been a director of the Company at all relevant times. In addition, Hurlston serves as the Company's Chief Executive Officer ("CEO").

15. Defendant Glenda Dorchak ("Dorchak") has been a director of the Company at all relevant times. In addition, Dorchack serves as the Chairperson of the Board's Compensation Committee.

16. Defendant Ned Hooper ("Hooper") has been a director of the Company at all relevant times. In addition, Hooper serves as a member on the Board's Nominating and Corporate Governance Committee.

17. Defendant Harold Hughes ("Hughes") has been a director of the Company at all relevant times. In addition, Hughes serves as the Chairperson of the Board's Audit Committee and as a member on the Board's Compensation Committee.

18. Defendant Jack Lazar ("Lazar") has been a director of the Company at all relevant times. In addition, Lazar serves as the Chairperson of the Board's Nominating and Corporate Governance Committee and as a member on the Board's Audit Committee.

19. Defendant John Scull ("Scull") has been a director of the Company at all relevant times. In addition, Scull serves as a member on the Board's Nominating and Corporate Governance Committee.

20. Defendant Mark A. Stevens ("Stevens") has been a director of the Company at all relevant times. In addition, Stevens serves as a member on the Board's Audit and Compensation Committees.

21. Defendants identified in ¶¶ 13 - 20 are collectively referred to as the "Individual Defendants."

22. Defendant ON Semiconductor Corporation manufactures and sells semiconductor components for various electronic devices worldwide. Parent is a corporation organized under the laws of the State of Delaware and has its principal place of business at 5005 East McDowell Road,

Phoenix, AZ 85008.  Parent common stock is traded on the NasdaqGS under the ticker symbol "ON".

23.     Defendant Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

25.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Quantenna has its principal place of business is located in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Quantenna common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

28.     This action is properly maintainable as a class action because:

a.  The Class is so numerous that joinder of all members is impracticable. According to the Preliminary Proxy, as of July 27, 2018, there were over 266 million shares of Quantenna common stock outstanding. The actual number of public stockholders of Quantenna will be ascertained through discovery;

b.  There are questions of law and fact which are common to the Class, including *inter alia*, the following:

    i.  Whether Defendants have violated the federal securities laws;

    ii.  Whether Defendants made material misrepresentations and/or omitted material facts in the Preliminary Proxy; and

    iii.  Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.  Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

CLASS ACTION COMPLAINT

g.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

29.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Quantenna and owe the Company the duties of due care, loyalty, and good faith.

30.     By virtue of their positions as directors and/or officers of Quantenna, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Quantenna to engage in the practices complained of herein.

31.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.  act with the requisite diligence and due care that is reasonable under the circumstances;

b.  act in the best interest of the company;

c.  use reasonable means to obtain material information relating to a given action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

   f. disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

  32. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Quantenna, are obligated to refrain from:

   a. participating in any transaction where the directors' or officers' loyalties are divided;

   b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

   c. unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

  33. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Quantenna, Plaintiff and the other public stockholders of Quantenna, including their duties of loyalty, good faith, and due care.

  34. As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Quantenna common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

  35. Quantenna designs, develops, and markets wireless communication solutions enabling wireless local area networking in the Asia-Pacific, Europe, the Middle East, Africa, and the Americas.

  36. The Company's solutions portfolio comprises radio frequency chips and digital baseband chips, which support the IEEE Wi-Fi standards, including 802.11n, 802.11ac, and the draft Wi-Fi 6 standard.

37.    Quantenna offers its products for home networking applications, including home gateways, repeaters, and set-top boxes, as well as retail, outdoor, small and medium business, enterprise, industrial, and consumer electronics applications.

38.    The Company sells its Wi-Fi solutions directly to original equipment manufacturers and original design manufacturers; and third-party distributors.

39.    The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated sustained and solid financial performance. For example, in a February 4, 2019 press release announcing its Q4 and Fiscal 2018 financial results, the Company highlighted such milestones as revenue of $220.5 million in fiscal year 2018, a 25% increase in revenue year-on-year, as well as a revenue of $62.6 million for Q4 2018, a 52% increase in revenue year-on-year.

40.    Speaking on these positive results, CEO Defendant Heidari stated, "Our strong fourth quarter and annual operating results showcase the success of our broad product portfolio as both our premium Wave 3 10G product and high-performance mainstream Wave 2 product experienced record revenue."

41.    Defendant Heidari went on to comment on a strong future outlook for Quantenna noting "We continue to experience strong customer engagement with our products, including our family of Wi-Fi 6 product offerings."

42.    These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success by Quantenna.  Clearly, based upon these positive financial results, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

43.    Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Quantenna to enter into the Proposed Transaction for insufficient consideration.

CLASS ACTION COMPLAINT

*The Flawed Sales Process*

44.    As detailed in the Preliminary Proxy, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to ON Semiconductor.

45.    The Preliminary Proxy also notes that the Quantenna Board executed the merger agreement with ON Semiconductor while an interested third party ("Party H") who had previously provided the highest bid for the Company remained active in the sales process.  Indeed, the Preliminary Proxy indicates that the Quantenna Board did not even attempt to contact Party H after March 24, 2019 and before executing such agreement to solicit a concrete bid in order to drive any potential price up or to address the claimed differences between certain requirements of Party H and ON Semiconductor with respect to Dr. Heidari's options and certain due diligence.

46.    In addition, the Preliminary Proxy indicates that no committee of independent board members was created to run the sales process.  This is especially concerning given that the decision by the Board to allow the Merger Agreement to be executed with a bidder – Party H – that had previously provided the highest bid and which wanted the Chairman and CEO, Dr. Heidari, to forego certain vesting.

47.    Moreover, the Preliminary Proxy is also unclear as to any differences that may exist between the various non-disclosure agreements entered into between Quantenna and any interested third parties.

48.    It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

*The Proposed Transaction*

49.    On March 27, 2019, ON Semiconductor and Quantenna issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**PHOENIX & SAN JOSE, Calif.--(BUSINESS WIRE)--Mar. 27, 2019--** ON Semiconductor Corporation (Nasdaq: ON) ("ON Semiconductor") and Quantenna Communications, Inc. (Nasdaq: QTNA) ("Quantenna") today

announced that they have entered into a definitive agreement for ON Semiconductor to acquire Quantenna for $24.50 per share in an all cash transaction. The acquisition consideration represents equity value of approximately $1.07 billion and enterprise value of approximately $936 million, after accounting for Quantenna's net cash of approximately $136 million at the end of fourth quarter of 2018. The acquisition significantly enhances ON Semiconductor's connectivity portfolio with the addition of Quantenna's industry leading Wi-Fi technology and software capabilities.

"We are very pleased to welcome Quantenna to ON Semiconductor's team. The acquisition of Quantenna is another step towards strengthening our presence in industrial and automotive markets. The combination of ON's expertise in highly efficient power management and broad sales and distribution reach, and Quantenna's industry leading Wi-Fi technologies and software expertise creates a formidable platform for addressing fast growing markets for low-power connectivity in industrial and automotive applications," said Keith Jackson, president and chief executive officer of ON Semiconductor. "I am very excited about the opportunity this acquisition creates for customers, shareholders, and employees of the two companies."

"Today's announcement is great news for Quantenna employees and customers worldwide. As part of ON Semiconductor, Quantenna will benefit from a world-class organization in our commitment to providing the best end user experience for our customers," stated Dr. Sam Heidari, chairman and chief executive officer of Quantenna. "We are proud of our accomplishments and look forward to a smooth transition with the ON Semiconductor team to pursue exciting new opportunities for Quantenna's talented employees and reinforce our longstanding position as a leading Wi-Fi technology innovator."

Following consummation, the transaction is expected to be immediately accretive to ON Semiconductor's non-GAAP earnings per share and free cash flow, excluding any non-recurring acquisition related charges, the fair value step-up inventory amortization, and amortization of acquired intangibles.

The transaction is not subject to a financing condition. ON Semiconductor intends to fund the transaction through cash on hand and available capacity under its existing revolving credit facility.

Completion of the transaction is subject to approval by Quantenna's stockholders, regulatory approvals and other customary closing conditions. The transaction has been approved by ON Semiconductor's and Quantenna's boards of directors and is expected to close in the second half of 2019. No approval of the stockholders of ON Semiconductor is required in connection with the proposed transaction.

Morrison & Foerster LLP served as legal advisor to ON Semiconductor. Qatalyst Partners acted as exclusive financial advisor to Quantenna, along with O'Melveny & Myers LLP, who served as legal advisor.

### The Inadequate Merger Consideration

50.     Significantly, the Company's financial prospects, opportunities for future growth, and synergies with ON Semiconductor establish the inadequacy of the merger consideration.

51.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements of the Company in recent years.

52.     For example, as shown above Quantenna's future success is extremely likely, given the consistent positive financial results it has posted over the past several quarters.  Obviously, the opportunity to invest in such a company on the rise is a great coup for ON Semiconductor, however it undercuts the investment of Plaintiff and all other public stockholders.

53.     Moreover, the Proposed Transaction represents a significant synergistic benefit to ON Semiconductor, which operates in the same industry as Quantenna, and will use the new assets, operational capabilities, and brand capital to bolster its own position in the market.  Specifically, Keith Jackson, President and CEO of ON Semiconductor stated in the press release announcing the Proposed Transaction, "The acquisition of Quantenna is another step towards strengthening our presence in industrial and automotive markets.  The combination of ON's expertise in highly efficient power management and broad sales and distribution reach, and Quantenna's industry leading Wi-Fi technologies and software expertise creates a formidable platform for addressing fast growing markets for low-power connectivity in industrial and automotive applications."

54.     Clearly, while the deal will be beneficial to ON Semiconductor it comes at great expense to Plaintiff and other public stockholders of the Company.

55.     Moreover, post-closure, Quantenna stockholders will be frozen out of any ownership interest in the Company, forever foreclosing the ability to see the true return on their investments.

56.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for ON Semiconductor at the expense of Quantenna stockholders, which clearly indicates that Quantenna stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

57.     The Merger Agreement contains certain provisions that unduly benefit ON Semiconductor by making an alternative transaction either prohibitively expensive or otherwise impossible.  Significantly, the Merger Agreement contains a termination fee provision that is especially onerous and impermissible.  Notably, in the event of termination, the merger agreement requires Quantenna to pay up to $32,165,000 to ON Semiconductor, if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Quantenna must pay this termination fee even if it consummates any competing Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

58.     The Merger Agreement also contains a "No Solicitation" provision that restricts Quantenna from considering alternative acquisition proposals by, *inter alia*, constraining Quantenna's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

59.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.   Here, the Individual Defendants agreed to provide ON Semiconductor information in order to match any other offer, thus providing ON Semiconductor access to the unsolicited bidder's financial information and giving ON Semiconductor the ability to top the superior offer.   Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of ON Semiconductor.

60.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

61.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

*Potential Conflicts of Interest*

62.     The breakdown of the benefits of the deal indicate that Quantenna insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.   The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Quantenna.

63.     Certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction.

64.     Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement. According to the Preliminary Proxy, "[a]ssuming the merger was completed on April 29, 2019, the estimated aggregate amount that would be payable to Quantenna's executive officers (i.e., Messrs. Heidari, Sobers and Carroll)

as a group for their Quantenna equity awards is as follows: (a) with respect to vested Quantenna stock options (including stock options that will vest in connection with the merger), $28,693,117, (b) with respect to unvested Quantenna stock options (that may become payable after the effective time as described above), $5,638,675, (c) with respect to vested Quantenna RSUs (including RSUs that will vest in connection with the merger), $0, and (d) with respect to unvested Quantenna RSUs (that may become payable after the effective time as described above and assuming PSUs will be eligible to vest as to 100% of the target number of shares subject to the award based on the actual level of achievement of the applicable performance goals through the effective time), $10,795,925 (or $11,815,125 assuming the PSUs would be eligible to vest as to the maximum number of PSUs subject to the award based on the actual level of achievement of the applicable performance goals through the effective time)."

65.    Moreover, certain employment agreements with certain Quantenna executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Quantenna's common stockholders.

66.    These payouts will be paid to Quantenna insiders, as a consequence of the Proposed Transaction's consummation, as follows:

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites/ Benefits ($)[3] | Total |
|---|---|---|---|---|
| Sam Heidari | 1,185,000 | 10,575,887 | 30,000 | 11,790,887 |
| Sean Sobers | 612,167 | 4,246,019 | 30,000 | 4,888,186 |
| David Carroll | 583,433 | 2,631,894 | 30,000 | 3,245,327 |

67.    Moreover, the Preliminary Proxy is silent as to any post-close employment agreements Company insiders may have signed with ON Semiconductor.

68.    Thus, while the Proposed Transaction is not in the best interests of Quantenna stockholders, it will produce lucrative benefits for the Company's officers and directors.

*The Materially Misleading and/or Incomplete Preliminary Proxy*

69.    On May 3, 2019, the Quantenna Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that, in violation of their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

70.    Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy fails to disclose:

a.    Why the confidentiality agreement entered into with Party B did not include a standstill agreement;

b.    The nature of any differences that exist between the various non-disclosure agreements entered into between Quantenna and any interested third parties

c.    The reasoning as to why no private equity sponsors were contacted during the sales process;

d.    Why no committee of independent board members was created to run the sales process;

e.    The specific reasoning as to why the Quantenna Board failed to communicate with Party H after March 24, 2019 and did not attempt to contact Party H before executing the Merger Agreement with ON Semiconductor and why the Board believed the Party H merger agreement draft was not "competitive";

f.    The basis for the Board's decision to discontinue negotiations with Party H, the party that had made the highest unsolicited offer in the process due to Party H's requirements that Dr. Heidari and other management enter into retention

agreements, the need for customer due diligence, and that Dr. Heidari forego acceleration of unvested equity.

g. What were the "potential completive dynamics and other considerations" that caused the Board to not reach out to Party B in and around March 14, 2019; and

h. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

_Omissions and/or Material Misrepresentations Concerning Quantenna's Financial Projections_

71.    The Preliminary Proxy fails to provide material information concerning financial projections provided by Quantenna's management and relied upon by Qatalyst in its analyses. The Preliminary Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Preliminary Proxy indicates that in connection with the rendering of Qatalyst' fairness opinions, "[w]ith respect to the management projections, Qatalyst Partners was advised by Quantenna's management, and Qatalyst Partners assumed, that the management projections had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Quantenna of the future financial performance of Quantenna and other matters covered thereby. With respect to the sensitivities, Qatalyst Partners was advised by the management of Quantenna, and Qatalyst Partners assumed, that they were also reasonable estimates and judgments as to the future financial performance of Quantenna and the other matters covered thereby, and Quantenna's management consented to Qatalyst Partners' use of the sensitivities for purposes of its opinion. Accordingly, the Preliminary Proxy should have, but fails to provide, certain information in the projections that Quantenna management provided to the Board, Qatalyst and BofA Merill Lynch. Courts have uniformly stated that "projections …

are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

72.    With respect to the "Management Projections," the Preliminary Proxy fails to provide material information concerning the financial projections prepared by Quantenna management. Specifically, the Preliminary Proxy fails to disclose material line items for Non-GAAP financial measures.

73.    Specifically, the Preliminary Proxy provides non-GAAP financial metrics, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

74.    Further, the Preliminary Proxy fails to provide the sensitized management projections in an understandable format. While incomplete, the Management Projections are set forth in a chart by category and fiscal year. In contrast, the sensitivities are only partially presented and only in narrative form – as a result, Company stockholders cannot adequately assess the sensitivities.

75.    This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

76.    Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of Quantenna are unable to properly evaluate the Company's true worth, the accuracy of Qatalyst's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction. As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Proxy.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Qatalyst*

77.     In the Preliminary Proxy, Qatalyst describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

78.     With respect to the *Selected Transactions Analysis*, the Preliminary Proxy fails to disclose the following:

        a.   The total value of each selected transaction; and

        b.   The specific date on which each selected transaction closed.

79.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose the following:

        a.   The specific inputs and assumptions used to calculate the discount rate range of 10.5% to 14.0%; as well as the WACC for the Company;

        b.   The specific inputs and assumptions used to calculate EV/NTM of 12.0x to 22.0x;

        c.   The number of Fully-Diluted shares and the Cash Net of Debt of the Company as of December 31, 2018;

80.     These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**(Against the Individual Defendants)**

81.     Plaintiff repeats all previous allegations as if set forth in full herein.

82.     The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

83. By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Quantenna.

84. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Quantenna by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Quantenna to its public stockholders.

85. Indeed, Defendants have accepted an offer to sell Quantenna at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

86. Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

87. The Individual Defendants dominate and control the business and corporate affairs of Quantenna, and are in possession of private corporate information concerning Quantenna's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Quantenna which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

88. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

89. As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Quantenna's assets and have been and will be prevented from obtaining a fair price for their common stock.

90.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

91.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### <u>Against Defendant Quantenna</u>

92.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

93.    Defendant Quantenna, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

94.    As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

95.    Plaintiff and the members of the Class have no adequate remedy at law.

## THIRD COUNT

### Violations of Section 14(a) of the Exchange Act

### <u>(Against All Defendants)</u>

96.    Plaintiff repeats all previous allegations as if set forth in full herein.

97.    Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

98.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

CLASS ACTION COMPLAINT

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

99.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following: No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

100.    The Preliminary Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

101.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

102.    The Individual Defendants were at least negligent in filing an Preliminary Proxy that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy not misleading.

103.    The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against All Individual Defendants)

104.    Plaintiff repeats all previous allegations as if set forth in full herein.

105.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Company stockholders.

106.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy.  The Individual

CLASS ACTION COMPLAINT

Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

107. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Quantenna's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Preliminary Proxy was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations contained herein.

108. The Individual Defendants acted as controlling persons of Quantenna within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Quantenna to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Quantenna and all of its employees. As alleged above, Quantenna is a primary violator of Section 14 of the Exchange Act and SEC Rule Preliminary Proxy. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining the Proposed Transaction;

C. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Quantenna and obtain a transaction which is in the best interests of Quantenna and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff, the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: May 9, 2019

**BRODSKY & SMITH, LLC**

By: _____

Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste. 900
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*